473 A.2d 1335

**Howard HINES**

**v.**

**STATE of Maryland.**

**No. 1094, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

April 17, 1984.

638

640

642

Clarence W. Sharp, Assigned Public Defender, with whom was Alan H. Murrell, Public Defender, on brief, for appellant.

Ann E. Singleton, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., Arthur A. Marshall, Jr., State's Atty. for Prince George's County and David Simpson, Asst. State's Atty. for Prince George's County, on brief, for appellee.

Argued before WILNER, BLOOM and GETTY, JJ.

BLOOM, Judge.

Howard Hines, appellant, was convicted by a jury in the Circuit Court for Prince George's County (Melbourne, J., presiding) of murder in the first degree (both premeditated and felony murder), attempted rape in the first degree, and third degree sexual offense. He received consecutive sentences of life imprisonment for the first degree murder and attempted first degree rape and a consecutive sentence of ten years imprisonment for the third degree sex offense. In this appeal, Hines asserts that:

1. the trial court erred in denying his motion to dismiss for violation of the Interstate Agreement on Detainers;

2. the trial court erred in denying his motion to dismiss based on the denial of his constitutional right to a speedy trial;

3. the trial court erred in admitting an oral statement obtained by Maryland police while appellant was in custody in Alabama;

4. the evidence was insufficient to support his convictions;

5. absent proof beyond a reasonable doubt that the victim was alive at the time of the alleged sexual acts, appellant could not be convicted of felony murder, attempted rape in the first degree and third degree sexual offenses;

6. the trial court erred in denying his motion for mistrial during the deliberations of the jury; and

7. the trial court erred in its instructions to the jury by
(a) instructing the jury with respect to flight as evidence of consciousness of guilt,
(b) failing to instruct the jury that it was necessary to prove that the victim was not unconscious at the time the alleged attempted first degree rape occurred, and
(c) failing to instruct the jury that the opinion of a medical expert must be within a reasonable degree of medical probability.

In our discussion, we will combine appellant's first two assertions under the general heading of "The Motions to Dismiss," and we will combine his fourth and fifth contentions under the general heading of "Sufficiency of the Evidence."

## I.  THE MOTIONS TO DISMISS

A.  *Chronology of Events*

On June 21, 1979, the nude body of Michiyo Nakada, a twenty-three-year-old student at the University of Maryland, was found in a ditch in a wooded area near the apartment house in which she resided.  She had been stabbed to death.  Appellant became a suspect in the homicide shortly after the crime.  Appellant's parole officer in Alabama was contacted, and an Alabama warrant for appellant was then put into the NCIC computer with a notation to contact the Maryland authorities if appellant was arrested or detained.  An F.B.I. fingerprint stop was also placed.  Nevertheless, no one notified police authorities in Maryland when appellant was eventually arrested in Atlanta, Georgia, on January 21, 1981, or when he was extradited from Georgia to Alabama in March 1981.  It was not until January 19, 1982, that Maryland police learned that appellant was in a prison in Alabama.

Corporal Mike Morrissette and Detective Michael Ferriter of the Prince George's Police Department went to Alabama and interrogated appellant at the prison on January 27, 1982.  Upon their return to Maryland, they obtained an arrest warrant charging appellant with the murder of Michiyo Nakada.  The warrant was issued in Maryland on February 1, 1982, and sent to the prison authorities in Alabama.  Appellant refused to accept the papers when service was attempted on February 20.  Appellant was subsequently indicted for murder, robbery and related offenses [1] on

---

**1.**  On March 3, 1983, an eleven count indictment was returned, charging appellant with first degree rape; first, second and third degree

March 31, 1982, and a copy of that indictment with detainer was sent to the prison officials in Alabama. On May 11, an attempt was made to serve appellant with a copy of the indictment and an Interstate Agreement on Detainers (IAD) Form I (which notifies the prison of the indictment and detainer, advises him of his rights under the Interstate Agreement on Detainers, and informs him of the procedures required to exercise those rights). Appellant refused to accept those documents. It was stipulated, however, that at some point in time appellant did receive a copy of the statement of charges with the arrest warrant that he had refused to accept on February 20.

On May 24, 1982, appellant sent various documents to the Clerk of the Circuit Court for Prince George's County. The documents, which were received and docketed on May 28, consisted of a four page, hand-lettered "Motion for Speedy Trial" to which was attached (1) a printed document labeled "Inmate Summary 02/09/82" that furnished some information as to appellant's prisoner status; (2) an affidavit (dated February 2, 1982, but not notarized until May 14, 1982) as to the truth of the matters asserted in the Motion and (3) IAD Form II, "Inmate's Notice of Place of Imprisonment and Request for Disposition of Indictments, Informations or Complaints." The IAD form was dated May 24, 1982. On the reverse side of the affidavit there is what appears to be a faint carbon copy imprint of a hand-lettered document addressed to Prince George's County Sheriff James V. Aluisi and entitled "Letter Requesting Resolution of Detainer."

Appellant contended that he made three copies of the Inmate's Notice of Place of Imprisonment and Request for Disposition (IAD Form II), sent one copy to Sheriff Aluisi at the Prince George's County Courthouse and one copy to the Clerk of the Court in care of the Attorney General, and kept one copy for himself. According to Captain William Feeney

---

sexual offenses; and attempts to commit each of those offenses. Over appellant's objection, the two indictments were consolidated for trial.

of the Sheriff's office, the practice of that office is to forward any IAD requests or requests for speedy trial to Ms. Walters in the State's Attorney's office and no record of receipt is retained by the Sheriff. Ms. Walters, in turn, was certain that the State's Attorney's office received no papers from the sheriff or directly from appellant. It did receive from the Clerk's office a photocopy of the hand-lettered motion for speedy trial with none of the exhibits attached thereto.

The State's Attorney forwarded a request for temporary custody (IAD Form V) to the Alabama prison authorities on September. 17, 1982. On November 22 appellant filed a motion to dismiss the indictment for denial of speedy trial. He was returned to Maryland on December 21 and arraigned on December 23. Additional motions were filed, including a motion to dismiss for violation of the Interstate Agreement on Detainers. The motions to dismiss were heard and denied by Judge Howard Chasanow. Thereafter, the rape indictment was returned. The motions to dismiss were renewed at trial and again denied.

B. *Interstate Agreement on Detainers*

The Interstate Agreement on Detainers, codified as Md. Ann.Code art. 27, §§ 616A through 616R, provides in Title III [§ 616D(a)] that a prisoner serving a term of imprisonment who has a detainer or an untried charge lodged against him by a prosecutor in another State

shall be brought to trial within one hundred eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint: ... The request of the prisoner shall be accompanied by a certificate of the appropriate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount

of good time earned, the time of parole eligibility of the prisoner, and any decisions of the State parole agency relating to the prisoner.

Subsection (b) provides:

> The written notice and request for final disposition referred to in subsection (a) hereof shall be given or sent by the prisoner to the warden, commissioner of corrections or other official having custody of him, who shall promptly forward it together with the certificate to the appropriate prosecuting official and court by registered or certified mail, return receipt requested.

Several supplemental provisions to the IAD have been added by the Maryland Legislature. Article 27, § 616Q, for example, provides:

> As to any request by a person imprisoned in another party state for trial in this State, written notice shall not be deemed to have been caused to be delivered to the prosecuting officer and the appropriate court of this State in accordance with § 616 D(a), ... until such notice or notification is actually received by the appropriate court and by the appropriate State's attorney of this State, his deputy, an assistant, or any other person empowered to receive mail on behalf of the State's attorney.

These notice requirements are designed to bring to the attention of the operative State officials the request of the prisoner so that such authorities can take the necessary steps, within the time provided, to set in motion the machinery necessary to bring the pending case to trial. *State v. Barnes*, 273 Md. 195, 328 A.2d 737 (1974). The notice requirements of § 616D(a), particularly the provision that the request of the prisoner "shall be accompanied by a certificate of the appropriate official having custody of the prisoner" containing the information specified, are "mandatory and not directory." *Isaacs v. State*, 31 Md.App. 604, 611, 358 A.2d 273 (1976). The purpose of these notice requirements is to enable the State's Attorney "to evaluate whether the nature of the charges pending against the

accused was of such a severe degree as to merit further trial in this State in the light of the sentence then being served in the other state that was a party to the interstate agreement." *Id.*

The burden is on the prisoner to request the benefits of the agreement. *State v. Wilson,* 35 Md.App. 111, 371 A.2d 140 (1977), *aff'd,* 281 Md. 640, 382 A.2d 1053, *cert. denied,* 439 U.S. 839, 99 S.Ct. 126, 58 L.Ed.2d 136 (1978). Therefore, before the interstate agreement is invoked, the prisoner must make a request for final disposition of his case in the appropriate manner. *State v. Boone,* 40 Md. App. 41, 388 A.2d 150 (1978). Upon receipt of the proper statutory notice, the State is expected to see that the case is actually tried within the 180 days, *Dennett v. State,* 19 Md.App. 376, 311 A.2d 437 (1973), but this period does not begin to run until the prisoner's notice and request are actually received by both the appropriate prosecuting officer and court. *Davidson v. State,* 18 Md.App. 61, 305 A.2d 474 (1973).

Appellant argues that he had attempted to comply with the IAD by his motion for speedy trial and that since the State's Attorney's office had received a copy of that motion there had been actual notice and substantial compliance to invoke the provisions of the IAD. Therefore, he contends, the State's failure to bring him back to Maryland and try him within 180 days required dismissal of the indictment as provided in § 616D(d).

Appellant relies on *State v. Barnes,* 273 Md. 195, 328 A.2d 737 (1974), to support his argument that when the State's Attorney and the "appropriate court" have actual knowledge that a prisoner is invoking the act, even though the notice is defective, failure to bring the prisoner to trial within the prescribed time will result in dismissal of the indictment. *Barnes,* however, involved the Intrastate Detainers Act, Md.Code Ann. art. 27, § 616S, where the required certificate of the person having custody of the prisoner, setting forth detailed information as to the prisoner's

status, is significantly less important to the State's Attorney than a certificate under the Interstate Agreement would be.

█ Moreover, a general motion for a speedy trial is not the same as a request for disposition under the IAD. *Wise v. State,* 30 Md.App. 207, 211, 351 A.2d 160 (1976). Based on the evidence before him, Judge Chasanow found that the State's Attorney had received only a copy of appellant's Motion for Speedy Trial without any of the attachments or exhibits filed with the Clerk. He also found that neither Ms. Walters nor the Assistant State's Attorney to whom the case was initially assigned ever examined the documents on file in the Clerk's office, there being no need to do so. Consequently, the State's Attorney did *not* have actual knowledge of appellant's intent to invoke the IAD. Those findings, being supported by uncontradicted evidence, are certainly not clearly erroneous and thus will not be disturbed on appeal. Md.Rule 1086.

The court did not err in denying appellant's motion to dismiss for the alleged violation of the IAD because, as Judge Chasanow correctly ruled, appellant did not properly invoke the IAD and there was no actual notice to the State's Attorney. There was no violation.

C. *Speedy Trial*

The determination of whether a defendant has been denied his constitutional right to a speedy trial requires the application of a balancing test, weighing the conduct of both the prosecution and the defendant with particular respect to the four factors set forth by the Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). These factors are (1) length of delay, (2) reason for delay, (3) the defendant's assertion of his right to a speedy trial, and (4) prejudice to the defendant as a result of the delay.

1. *Length of delay*

In making our own independent constitutional determination of whether appellant was denied his Sixth Amendment

right to a speedy trial, we turn first, as did Judge Chasanow, to the factor of length of delay. In order to ascertain the length of delay, we must first determine when the speedy trial right was activated.

■ At the hearing on appellant's motion for dismissal, Judge Chasanow properly disregarded the lapse of time from June 1, 1979 (the date of the crime) to February 1, 1982 (the date the warrant was issued). The Supreme Court of the United States has made it abundantly clear that

> the Sixth Amendment speedy trial provision has no application until the putative defendant in some way becomes an "accused...."
>
> ... On its face, the protection of the Amendment is activated only when a criminal prosecution has begun and extends only to those persons who have been "accused" in the course of that prosecution.

*United States v. Marion,* 404 U.S. 307, 313, 92 S.Ct. 455, 459, 30 L.Ed.2d 468 (1971). Any lapse of time between the crime and the date on which the accused is arrested or charged with the crime can be considered only in terms of due process of law or statutes of limitation; the Sixth Amendment speedy trial clause has no relevancy to that interval of time. *Id.* at 321–325, 92 S.Ct. at 463–466.

■ Based upon several decisions of this court, including *State v. Lawless,* 13 Md.App. 220, 283 A.2d 160 (1971); *State v. Hunter,* 16 Md.App. 306, 295 A.2d 779 (1972); and *Gee v. State,* 54 Md.App. 549, 459 A.2d 608 (1983), Judge Chasanow concluded that the Speedy Trial Clause was activated by the issuance of the warrant on February 1, 1982. In *Lawless* 13 Md.App. at 229, 283 A.2d 160 we stated that in reckoning delay for speedy trial purposes "we look only at the time from the commencement of the prosecution (by way of warrant, information or indictment) to the time of trial"; in *Hunter,* based on *United States v. Marion, supra,* we added an actual arrest to the circumstances that will invoke the speedy trial; in *Gee,* we specifically

rejected the State's contention that the speedy trial clock begins with the actual arrest rather than the earlier issuance of the arrest warrant. We were wrong. In reversing us in *State v. Gee*, 298 Md. 565, 471 A.2d 712 (1984), the Court of Appeals pointed out that when the crime is one that can only be tried in the circuit court upon an indictment or information (as distinguished from an offense triable upon a warrant in the district court), the issuance of the warrant does not activate the speedy trial right because it is not a "formal charge." After the warrant charging Gee with robbery and related offenses was issued, Gee was arrested and incarcerated for other crimes. A detainer on the robbery charge was filed, and Gee requested disposition of the robbery case under the Intrastate Detainer Act. The arrest warrant was then served on him and he was later indicted. The Court declined to decide whether the lodging of the detainer, which is arguably equivalent to arrest in many respects, activated the speedy trial right. The Court held that in any event the arrest one month later did activate the rights and, whether counting from date of arrest or the earlier date of detainer, the interval from that date to the date of trial (less than six months) was not of constitutional dimension.

In the case *sub judice*, the original detainer and warrant were received by the Alabama prison authorities on February 3, 1982; the date of the indictment was March 31, 1982; appellant's motion for dismissal was heard January 21, 1983. A trial date had been set but immediately after his motion to dismiss was denied, appellant requested a postponement. Counting from the indictment to the hearing on the motion, we note a delay of nine months and twenty-one days; counting from date of detainer instead, we note a delay of eleven months and ten days. Either would be of constitutional dimension and sufficient to trigger the *Barker v. Wingo* balancing test.

### 2.  *Reason for delay*

■  We agree with Judge Chasanow's conclusion that the two month period of time between warrant and indictment

(one month, three weeks between detainer and indictment) was not unreasonable and that the next fifty-eight days to May 28 (when appellant's request for a speedy trial was received) would be the result of reasonably normal processing, considering the fact that appellant was incarcerated in another state. We regard that time as neutral, i.e., not chargeable to either party.

■ When William Shockley, the Assistant State's Attorney then in charge of the case, received a copy of appellant's motion for speedy trial, he made a deliberate choice not to request that appellant be returned to Maryland for trial at that time. It was not until September 17 when the IAD Form V, "Prosecutor's Request for Temporary Custody," was sent to Alabama. Mr. Shockley explained that because the crime had occurred almost three years earlier, he could not be sure that the principal witnesses for the State would be available for trial within the 120 day period allowed the State after such request is honored.[2] He testified that when Ms. Walters asked him in May about filing a prosecutor's request for custody he told her not to file it at that time

[b]ecause I didn't want to file the paper work and then be caught in a time limitation, where we would bring the defendant back, and then find out that we can't locate these witnesses. I felt it would be better to try to locate the witnesses, sufficient witnesses, that we could at least prove the case, and then file the paper work and bring the defendant back. At least that way we wouldn't be working under a severe time restraint as 120 days, once he came back to Prince George's County.

Judge Chasanow weighed that period of three months and twenty days heavily against the State but not as heavily as

---

2. There were 56 prospective State's witnesses. The State was never able to locate all of them. One of the principal witnesses for the prosecution was living with her parents in Florida. Other witnesses were eventually located in California and Michigan. Most of the witnesses were dispersed throughout Maryland and Washington, D.C.

he might have weighed it were it not for Mr. Shockley's explanation. In our view, although that period of time is clearly chargeable to the State, it should be given only little weight. The decision to make sure that critical witnesses were available before requesting custody of appellant through the IAD was a reasonable one made necessary by the fact that two-and-a-half years had elapsed after the crime was committed until appellant was found to be in an Alabama prison. Appellant bears responsibility for *that* lapse of time.

On October 6, 1982, the prison authorities in Alabama advised the governor of that state of Maryland's request for temporary custody of appellant under the IAD. Since the IAD allows the prisoner thirty days within which to file an objection to such request, the period of thirty days after October 5 was properly found by Judge Chasanow to be neutral, not chargeable to either party.

Considering the complexity of the case, the number of witnesses and the logistics of bringing appellant back to Maryland (he was returned to Maryland on December 23, 1982, and indicted), the periods of time from the first week in November to January 21, 1983 (hearing on motions to dismiss) and then to March 3, 1983 (the scheduled trial date) were reasonable, normal times for orderly processing and scheduling. Indeed, taking into account the nature of the crime, the number of witnesses, the fact that it took the State two-and-a-half years to find appellant after he became the principal suspect and the fact that appellant was then in an Alabama prison, the entire period of time except for three months and twenty days to the proposed trial date of March 3, 1983, represents normal, reasonable time for orderly processing and scheduling. The delay from March 3 to May 24, 1983, when the trial began, was requested by appellant and is chargeable to him. The period of three months and twenty days from May 28, 1982, to September 17, 1982, must be charged against the State because the prosecutor intentionally chose not to take steps to have appellant returned to Maryland during that time. As we

have indicated, however, we assign very little weight to that period since appellant's conduct made such choice a reasonable and prudent one.

### 3. *Assertion of right to speedy trial*

Appellant unquestionably asserted his right to a speedy trial by filing a hand-lettered request for speedy trial in May 1982. What is questionable is the sincerity of that request. As Judge Chasanow pointed out, if appellant had accepted the warrant and IAD Form I when the Alabama prison authorities attempted to serve them on him in February 1982 and if he had thereafter properly invoked the IAD, he could have insured that his trial would take place within 180 days. Instead of making a proper request through the warden of the prison in which he was incarcerated, appellant sent the wrong papers to the wrong place.

### 4. *Prejudice to appellant*

Appellant was not incarcerated as a result of this murder charge. He was incarcerated as a result of a parole violation in Alabama. Although there was evidence that the pendency of a murder charge in another state would require that appellant be placed in the category of "close supervision," there was other evidence to the effect that that factor was irrelevant inasmuch as appellant was being held in isolation or segregation as a result of two fights in May 1982. Judge Chasanow's finding of fact that the type or nature of appellant's incarceration was not made more burdensome by the pendency of the murder charge is not clearly erroneous.

Appellant complained that the delay in bringing him to trial made it difficult for him to locate favorable witnesses. Based on the evidence pertaining to the State's difficulty in locating its witnesses, Judge Chasanow found that the difficulty confronting both parties in locating witnesses was primarily due to the two-and-a-half year delay between June 21, 1979, and January 1982 rather than the one year delay

after appellant was discovered to be in an Alabama prison. The earlier, longer period was found to be more critical. Again, this finding is not clearly erroneous.

■ There is, of course, a presumption of prejudice to the accused resulting from any delay in bringing him to trial, if for no other reason than the fact that the mere pendency of the charge will undoubtedly prey on his mind. We assign some weight to this factor but not much weight.

*Summary—speedy trial*

■ Having weighed and balanced all of the factors in accordance with our constitutionally mandated obligation to make an independent determination on the speedy trial issue but giving due deference to Judge Chasanow's first level fact finding, we have no hesitancy in holding that appellant was not denied his constitutional right to a speedy trial.

## II. APPELLANT'S ORAL STATEMENT

Corporal Mike Morrissette and Detective Michael Ferriter of the Prince George's County Police Department went to Alabama and interrogated appellant in an investigative unit office at the Kilby Correctional Facility on January 27, 1982. Throughout the interrogation, which extended over a period of some fifteen hours, appellant denied committing the crime even when the officers directly accused him of it. According to the officers, however, appellant did make certain statements they regarded to be inculpatory. Appellant told them that an acquaintance in Washington sent him to John Dent to see if he could get a maintenance job at the apartment complex. On the day of the homicide after helping Dent, he got high on marijuana and walked to Prince George's Plaza. On the way back through the path in the woods he met two boys and asked them for marijuana. He also saw a girl or some children with school books and a girl with a grocery bag. The next thing he remembered he was back in Dent's apartment. When Dent's

brother told him about the murder, he changed clothes and left because he thought the police would suspect him since he was a new face in the area. He left that evening, took a bus to Washington and then to New York City. When Detective Ferriter gave him a scenario in which he was accused of the murder, appellant replied that if that was the way the police said it happened then that was the way it happened. Then when Ferriter asked him about his feelings, appellant responded, "Just because I killed her didn't mean I have to feel anything."

 Although the statements and comments made by appellant during this custodial interrogation do not constitute a confession to the crime, they do amount to factual admissions and incriminating statements. There is a clear distinction between a confession and an admission, but the test for their receipt into evidence is the same. *Stewart v. State*, 232 Md. 318, 193 A.2d 40 (1963). Admissions or incriminatory statements are admissible into evidence only if they meet the test of voluntariness in the "traditional sense," i.e., only if they were the product of a free and unconstrained will and were not extracted by any sort of threat or violence or obtained by direct or implied promises and if they were not the product of physical or psychological coercion. *Stewart v. State, supra; State v. Kidd*, 281 Md. 32, 375 A.2d 1105 (1977); *Hale v. State*, 5 Md.App. 326, 247 A.2d 409 (1968).

 Appellant's contention that the court erred in denying his motion to suppress his statement is based primarily on his assertion that the sheer length of an interrogation, which in this case was over fifteen hours with breaks only to eat or go to the bathroom, can be sufficient to erode a suspect's will to resist. When the interrogation occurs in a police station (or in this case, inside a prison) and extends into the night, the coercive effect is exacerbated. Appellant argues that "[i]n such circumstances slowly mounting fatigue does, and is calculated to, play its part." *Spano v. New York*, 360 U.S. 315, 322, 79 S.Ct. 1202, 1207, 3 L.Ed.2d

1265 (1959). He also complains that the police were sure in their own minds that he was guilty and told him so. They had studied his psychological profile and were using procedures indicating that they were engaged in a battle of wills with appellant and intended to project an image that would betray no weakness on their part.

Corporal Morrissette and Detective Ferriter orally advised appellant of his *Miranda* rights before initiating the interrogation. They did not obtain a written waiver and made no attempt to obtain either a written statement or a tape-recorded statement. They did take notes from which they prepared a written report, thereafter discarding their notes.

The officers' testimony was somewhat at variance with appellant's contentions. Corporal Morrissette had read the psychological profile that had been prepared by the Alabama prison authorities. That report indicated that appellant intensely hated women and that he felt he was intellectually superior. It contained details of the rape case for which appellant was incarcerated, and it indicated how appellant conducted himself on a one-to-one basis. Morrissette acknowledged that this profile helped him develop a strategy for his interrogation. Detective Ferriter had also read the profile but did not believe that they would have any difficulty with appellant. The officers denied planning any joint strategy. According to them, appellant never seemed reluctant to talk. He was furnished with food and cigarettes and permitted to go to the bathroom whenever he asked to do so. In addition to recesses for meals and bathroom privileges, there was a suspension of the interrogation for several hours while the police obtained hair samples and blood samples from appellant pursuant to a court order. It was appellant, not the police, who stated that he was engaged in a contest of wills. He boasted that he was strong and would not confess.

Judge Melbourne, who presided over the suppression hearing, chose to believe the officers' version. She noted

that appellant had had prior experience with the police and the criminal justice system and was clearly not "an innocent choir boy fresh out of seminary school." Appellant viewed the interrogation as a contest of wills. He did not fall apart, he was not overwhelmed and, in the final analysis, he did not confess. Judge Melbourne found that appellant remained sharp enough to frustrate the efforts of two seasoned detectives.

We give great weight to Judge Melbourne's findings of first level facts, *Fidazzo v. State*, 32 Md.App. 590, 591, 363 A.2d 583 (1976); and exercising our own independent judgment with respect to the final conclusion, we concur in the determination that appellant's oral statements to the police were voluntary. There was no error in the denial of appellant's motion to suppress those statements.

## III.  SUFFICIENCY OF THE EVIDENCE

A.  *The facts of the crime*

The victim, Michiyo Nakada, was a twenty-three-year-old student at the University of Maryland in College Park. She lived off campus in an apartment at Highview Terrace. On the morning of June 21, 1979, she attended classes and then left College Park to return to her apartment between 2:00 and 2:30 p.m. After purchasing some groceries at a supermarket in Prince George's Plaza, she walked along a dirt path through a wooded area used as a short cut between the shopping mall and Highview Terrace. She was carrying her books and a grocery bag.

At around 3:00 to 3:30 p.m., five teenagers walking through the wooded area found the victim's nude body in a ditch some 47 feet off the pathway. She was lying on her back with her legs spread apart. Her halter top was over her face with the rest of her clothes piled beside her. Her purse was found on the path about 60 yards away. Items had been removed from it, and some were partially burned. Her school books and grocery bag were found approximately 50 yards north of the ditch.

Miss Nakada had been stabbed repeatedly. The medical examiner who performed the autopsy identified numerous stab wounds with at least one in the heart, six in the lungs and three in the kidney and liver. There was an abrasion over the chin and right eye and a bruise on the neck. The victim's hair, right side of her face and pubic area had been burned. The autopsy revealed a superficial tear of the anterior part of the anal verge without hemorrhage; there were no signs of trauma or spermatozoa in the vaginal area. The medical examiner testified that the cause of death was a stab wound. He could not say in what sequence the various wounds were inflicted. Several were relatively superficial. Any one of numerous stab wounds into the lungs, liver and kidney would have been fatal; one of the wounds into the heart would have caused death within seven or eight minutes. The medical examiner was also unable to determine with any reasonable degree of medical certainty whether the victim was alive or dead at the time the burns to her head were inflicted. Nor could he give an opinion as to whether there had been either vaginal or anal penetration; the anal tear could have resulted from a variety of external forces.

Several witnesses saw appellant in and around the Highview Terrace apartment complex at various times during the day of the murder. Darnell Sterling, who was fifteen years old at the time, saw appellant in one of the apartment buildings in the morning and later, about 1:30 p.m., saw him outside and spoke to him. Appellant asked Sterling for some marijuana, and Sterling told appellant he did not smoke. While they were talking, Dolphus Simmons, Sterling's friend, joined them for a few minutes. Then he and Sterling left appellant standing by a tree. Later that day around dusk, Simmons saw appellant come out of the apartment building 7015 and walk away from the apartment complex. Appellant had changed his clothes and his hairstyle and was carrying a gym bag.

Betty Tisch had observed appellant around the Highview Terrace apartments and knew that he was staying in the apartment of John Dent, her upstairs neighbor. Between 3:30 and 4:00 p.m. on the day of the murder, Ms. Tisch saw appellant sitting on the outside steps of her apartment building. He had mud on his pants and appeared nervous. Around 4:30 p.m. she went outside and spoke to appellant. Appellant told her that the body of a woman had been found in the woods and asked her if anyone had ever been killed around there before. When she told him no one had, appellant left, heading in the direction of the end of the building.

Around 3:00 p.m. on the day of the murder, Virginia Boating glanced through her apartment window and saw a man walk aimlessly out of the woods and then walk back in. The man was disheveled and had mud on his pants. She assisted in the making of a composite drawing of the man she saw and was unable to find his photograph in the mug shot books shown to her. In April 1982, however, she thought appellant's photograph "look[ed] familiar for some reason."

Sharon Myers, who was fourteen years old at the time, was walking through the wooded area with four friends around 3:00 p.m. or a little later on June 21, 1979. They smelled smoke. The others were frightened when Sharon said there was a dead girl back in the woods, but she and Kenneth Stodes walked back into the woods, where she saw a man standing over an object on the ground. She ran back to her apartment but did not tell anyone what she had seen until the following day. She told the police she saw only the back of the man's head, his hand and one foot and then ran away. Several days later, however, she identified a photograph of appellant as that of the man she had seen in the woods. When she testified in court, four years later, she said that appellant could be the man but his appearance had changed.

Tony Davis, also known as Tony Dent, lived in John Dent's apartment, where appellant was staying. He and his friend Fred Washington both testified that they saw appellant running from the woods about 3:00 p.m. on the date of the murder.

The resident manager of the Highview Terrace Apartment complex testified that appellant had applied to him on the day of the murder for a job as a maintenance worker. Appellant was given a job application but never returned it. He never saw appellant again.

B. *The standard of review*

The Court of Appeals set forth the standards for appellate review of the sufficiency of evidence to support a conviction in *State v. Rusk*, 289 Md. 230, 240, 424 A.2d 720 (1981):

> Of course, due process requirements mandate that a criminal conviction not be obtained if the evidence does not reasonably support a finding of guilt beyond a reasonable doubt. *Tichnell v. State*, 287 Md. 695, 415 A.2d 830 (1980). However, as the Supreme Court made clear in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the reviewing court does not ask itself whether *it* believes that the evidence established guilt beyond a reasonable doubt; rather, the applicable standard is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 443 U.S. at 319 [99 S.Ct. at 2789] (emphasis in original)."

C. *Criminal agency*

Although there were no eyewitnesses to the crime and no physical evidence directly linking appellant to it, there was ample circumstantial evidence from which a rational trier of fact could find that appellant killed Miss Nakada. A number of witnesses testified that appellant was in the general vicinity before and after the crime. He was observed by

some witnesses around 3:00 p.m. coming out of the wooded area in which the body was found, which would have to be shortly after the crime was committed. By his own admission he was on the path in the woods and saw a girl with a grocery bag (inferentially, Miss Nakada) and a girl or some children (inferentially, Sharon Myers and her schoolmates). His statement about meeting two boys and asking them for marijuana confirmed the testimony of Darnell Sterling and Dolphus Simmons. He was identified by Sharon Myers as the man she saw standing over the body when the smell of smoke was still in the air. The ravine in which the victim's body was found was muddy; appellant's clothing, particularly the knees of his trousers, was muddy. That evidence, coupled with the description of appellant's general appearance and conduct on the afternoon of the murder; his flight to avoid being questioned by the police; his claim of partial amnesia, i.e., his statement that after seeing the schoolchildren and the girl with the grocery bag the next thing he remembered was being back in Dent's apartment; and his reported statement that "just because [he] killed the girl didn't mean [he] had to feel anything," was more than sufficient to give rise to a permissible inference that appellant was the person who killed Michiyo Nakada. Therefore, viewing the evidence in the light most favorable to the prosecution, the jury could have found that appellant was the criminal agent beyond a reasonable doubt.

D. *Corpus delecti*

The sufficiency of the evidence with respect to each element of each crime of which appellant was convicted will be subjected to the same standard of appellate review that we applied to the question of appellant's criminal agency. *Jackson v. Virginia, supra; State v. Rusk, supra.*

1. *Felony murder*

Appellant contended that the evidence was insufficient to support the conviction of felony murder because it failed to establish the underlying felony of rape. During oral argument his counsel conceded that there was sufficient evi-

dence to support the conviction of felony murder on the theory that robbery was the underlying felony. To that concession we would merely add that murder in the *attempt* to commit rape would be felony murder, even if the rape never occurred.

In any event, as appellant's counsel acknowledged, since the jury convicted appellant of premeditated first degree murder, it is fruitless to debate the sufficiency of the evidence as to felony murder.

### 2. *Attempted rape and third degree sex offense*

Appellant raises several arguments as to sufficiency of the evidence of attempted first degree rape and third degree sex offense. He first suggests that because there was no evidence of either vaginal or anal penetration, no signs of spermatozoa or trauma in the vaginal area and the slight anal tear could have been caused by a variety of external forces, it would be sheer speculation to conclude from the position and condition of the body that a first degree rape had been attempted or that a third degree sexual offense had occurred. His second argument is that in the absence of proof that the victim was alive when the alleged sexual acts were committed, there is insufficient evidence of the corpus delecti of either offense because a corpse cannot be raped or sexually abused.

The fact that Miss Nakada's body was nude; that her halter top was over her face and the rest of her clothing was piled beside her; that she was lying on her back with her legs spread apart gives rise to permissible inferences that (a) there had been a sexual touching without her consent and (b) that her assailant intended to rape when he attacked her. It is true that other inferences might be drawn from the same facts; but despite frequent expressions to the contrary, circumstantial evidence may be sufficient to support a conviction even if the circumstances do not exclude every hypothesis consistent with innocence. *See Finke v. State,* 56 Md.App. 450, 468 A.2d 353 (1983).

▮▮▮ By the same token, it is not necessary that the circumstances exclude the possibility that the victim was dead before any sexual touching or attempted rape occurred. In the absence of any evidence of necrophilic tendencies or habits on the part of appellant, it is considerably more reasonable and logical to infer that Miss Nakada was still alive when the sexual touching and attempted rape took place. Furthermore, appellant's argument seems to be based on the theory that an attempted rape does not occur until there is an attempted penetration. Such is not the case. An attempted rape occurs when the perpetrator forms an intent to rape and takes any action to carry out that intention. *Christensen v. State,* 33 Md.App. 635, 639, 365 A.2d 562 (1976). Thus, in this case, since the jury could rationally infer from the condition and position of the victim's body that her assailant intended to rape her, it could logically infer that such intent existed at the time of or prior to his assault on her.

▮▮ Finally, the existence of the weapon that was used to kill Miss Nakada is a circumstance sufficient to raise the necessary inference that the inferred attempted rape constituted an attempted rape in the first degree.

## IV. MOTION FOR MISTRIAL

▮▮ The jury began its deliberations at 8:45 a.m. on Friday, June 3, 1983. At 1:40 a.m. on Saturday, June 4, the jury sent the following note to the court:

Your Honor—

Our status is as follows:

We have not been able to reach unanimous agreement that the defendant has been proven beyond a reasonable doubt to be the criminal agent involved in these charges. Our votes, taken at various times, have been:

| Time | Guilty | Not Guilty |
| --- | --- | --- |
| 1 p.m. | 8 | 4 |
| 2:15 p.m. | 9 | 3 |
| 5:00 p.m. | 9 | 3 |
| 10:00 p.m. | 9 | 3 |
| 12:35 a.m. | 9 | 3 |

Of the 3 in the minority, two jurors state that further discussion might be helpful. The third states that nothing can be done to change the "not guilty" position. The court informed counsel of the note but refused to divulge the numerical division and omitted the comment that one juror stated that nothing could be done to change his position. Appellant's counsel moved for a mistrial. That motion was denied, as was appellant's request that the jury be polled as to whether further deliberations would be useful. Instead, the court admonished the jury not to furnish the vote count in any future communications. The jury was given the choice of continuing its deliberations that night or recessing to resume in the morning, and it opted for the latter. The jury reconvened shortly after 11:00 a.m. and continued deliberating without further interruption or message to the court until shortly after 7:00 p.m. when it returned its verdict. Appellant renewed his motion for a mistrial after about six hours of deliberations on the second day. The court denied that motion as well. There was no request for an *Allen* charge and none was given.

The granting of a mistrial is within the sound discretion of the trial judge. In the exercise of that discretion, the judge should declare a mistrial only where it is "manifestly necessary" or under urgent or extraordinary circumstances. Declaring a mistrial is not to be undertaken lightly. *Cornish v. State,* 272 Md. 312, 318, 322 A.2d 880 (1974).

Here, Judge Melbourne correctly assessed the jury's note as a status report rather than a report of a hopeless deadlock. She did nothing to coerce the jury. Indeed, she did nothing but permit it to continue its deliberations. We find no abuse of discretion.

## V. JURY INSTRUCTIONS

A. *Flight*

The court instructed the jury that intentional flight of a defendant immediately after the commission of a crime is not sufficient to establish guilt but may be considered as

tending to show a consciousness of guilt. Appellant took exception to that instruction on the grounds that the evidence did not warrant it.

Appellant argues that there was no evidence that he had fled the scene of the crime immediately after its commission. On the contrary, he asserts, the evidence shows that he walked out of the woods, then back into the woods, and remained talking to Dent and his brother until dusk, between four and five hours after the approximate time of the crime.

Appellant places too restrictive a meaning on the word "immediately" as used in the instruction. According to Detective Ferriter, appellant admitted to him that he told John Dent he was leaving because the police would think he was the murderer. He changed clothes and altered his hairstyle before he left. He took a bus to Washington and then to New York. That conduct was evidence of flight as soon after the crime as appellant could reasonably arrange it.

Flight from the scene of a crime is a factor that may be considered in determining guilt. *Tasco v. State*, 223 Md. 503, 509, 165 A.2d 456 (1960); *Clay v. State*, 211 Md. 577, 128 A.2d 634 (1957). Flight does not have to be practically contemporaneous with the crime to be evidence of some consciousness of guilt, but the lapse of time between the crime and the flight goes to the weight to be accorded to the circumstance. *Davis v. State*, 237 Md. 97, 105, 205 A.2d 254 (1964). Indeed, not only flight from the scene but any flight from justice, escape from custody, resistance to arrest, concealment, assumption of a false name and related conduct are admissible as evidence of consciousness of guilt and thus of guilt itself. Wigmore, *Evidence* § 276 (3d ed. 1940), cited in *Davis v. State, supra,* at 105, 205 A.2d 254.

We see no error in granting the instruction.

B. *Failure to instruct that State must prove that victim was conscious at time of attempted first degree rape*

■■■ Appellant requested an instruction with respect to the attempted first degree sexual offenses that the State had the burden of proving that the victim was not unconscious at the time of these offenses. The court refused to grant such an instruction, and appellant claims that the refusal constituted error.

Appellant concedes that the court instructed the jury with respect to attempted rape in the first degree, attempted sexual offense in the first degree and sexual offense in the third degree in the language of the statutes. He argues, however, that since sexual offenses with a physically helpless or unconscious person are second degree sexual offenses, proof that the victim was not unconscious is an essential element of a first degree sexual offense.

The simple answer to this contention is that appellant was not convicted of first degree rape or first degree sexual offense. He was convicted of attempted first degree rape. Whether the victim had been rendered unconscious prior to an actual attempted penetration is immaterial. All that is required by way of proof is that the victim was conscious when appellant formulated the intent to commit a sexual offense upon her and took the first step to carry out that intention. There is not the slightest evidence suggesting that she was unconscious at that time.

C. *Failure to grant requested instruction as to expert witnesses*

Appellant requested an instruction to the effect that an opinion by an expert must be rendered to a reasonable degree of probability within the expertise of the witness. He contends that the court's refusal to give such an instruction constituted error. We disagree.

The court gave an instruction with respect to expert witnesses and their testimony which included the following:

However, this testimony [the testimony of experts] should be considered and weighed by you like any other evidence in the case. And it is to be given the weight to which you deem the opinion is to be entitled. You may reject the opinion, if the facts upon which it is based have not been established to your satisfaction by the evidence, or if you are not satisfied with the reasons given in support of the opinion.

Appellant argues that that instruction, although not improper, was inadequate. Citing *Andrews v. Andrews*, 242 Md. 143, 218 A.2d 194 (1966), and *Wantland v. State*, 45 Md.App. 527, 413 A.2d 1376 (1980), as authorities, he contends that a medical expert is not required to state an opinion with absolute certainty, reasonable probability being the test of admissibility.

Appellant is confusing a rule of evidence with substantive law. If an expert witness cannot, will not or does not render his opinion to a reasonable degree of probability within the field of his expertise, the opinion may be excluded from evidence. Whether to permit the introduction of evidence is a decision for the trial judge in the exercise of sound discretion. Once evidence is admitted, however, it is for the jury to determine what weight, if any, it deserves. In that respect, the instruction given by the court was proper and adequate. It is neither required nor appropriate for the court to instruct the jury on the law governing the admissibility of evidence.

Having found no error in the denials of appellant's motions for dismissal, suppression of evidence and for a mistrial or in the instructions to the jury and having determined that the evidence was sufficient to support appellant's convictions, we will affirm the judgments of the circuit court.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.