Sᴛᴀᴛᴇ ᴏꜰ Kᴀɴꜱᴀꜱ, *Appellee*, v. Dᴇɴɴɪꜱ D. Pᴇʀᴋɪɴꜱ, *Appellant*.

(811 P.2d 1142)

Opinion filed May 24, 1991.

*J. Patrick Lawless, Jr.,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant.

*John K. Bork,* assistant attorney general, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by Dennis D. Perkins from his convictions for first-degree murder, aggravated robbery, and rape. Perkins pled insanity.

Perkins raises six issues on appeal. He contests the voluntariness of his confessions; claims he was incompetent to stand trial (and that he was denied his statutory and constitutional right to be present during an in-chambers discussion of his competency); argues he was entitled to an instruction that rape cannot occur after the victim is dead; argues a mistrial should have been granted because of his conduct during trial; claims he was entitled to an instruction on second-degree murder and on manslaughter; and argues the evidence was insufficient for the jury to find him other than insane at the time of the crimes.

The victim, Alice Pepperl, resided in and managed the Country Club Motel in Oakley, Kansas. Perkins was hitchhiking through Kansas and found himself stranded and broke in Oakley, Kansas. Mrs. Pepperl gave him a room at the Country Club Motel and employed him to paint and "fix up" rooms in the motel. Perkins had been in Oakley for one week when Mrs. Pepperl was killed. Perkins' work at the motel was satisfactory and he had made acquaintances in local clubs.

At 8:30 a.m. on December 7, 1988, a friend of Pepperl's found her at her residence in the motel lying naked on her bed with a coat hanger and electrical cord wrapped around her neck and a knife protruding from her stomach. The coroner, who arrived at 11 a.m., estimated the time of death as two to ten hours earlier.

An autopsy revealed that Mrs. Pepperl's death was due to asphyxiation caused by the coat hanger wrapped around her neck. The knife wound occurred after her death. There were reddish markings on the opening of the victim's vagina, indicating penetration by some object, although no semen was detected. A bloodstain found on the victim's housecoat was determined to be consistent with Perkins' blood type, and of a type found in 13.5 percent of the Caucasian (defendant's) race. The bloodstain was not consistent with the victim's blood.

The cash drawer in the office adjacent to Pepperl's quarters was locked. When it was opened, it was found to contain 47 cents. It should have contained approximately $100.

Although police attempted to take fingerprints from the room, they did not find prints of Perkins. Pepperl always kept a quarter with a hole in it in the cash drawer for good luck and it was also missing. On the morning of December 7, Perkins gave a quarter with a hole in it to a clerk at a convenience store. The clerk testified that Perkins had scratches on his cheek that were a finger width apart.

Later on December 7, Perkins was picked up in a Scott City bar where he was drinking beer. Perkins had $77.60 in his possession when he was arrested.

Perkins was read his *Miranda* rights at the Scott City Jail by Gary Ledbetter, the chief of police in Scott City. He gave Perkins a waiver form with the rights printed on it, but Perkins indicated that he could not read or write. The police chief read each statement to him and asked him if he understood each right. Perkins replied "yes" to each right. The police chief asked Perkins if he wanted to waive his rights and talk. Perkins replied "yes". The police chief showed Perkins how to mark the form and where to sign it.

Another Scott City police officer, Greg Davis, arrived at the police station and again advised Perkins of his rights, using the same procedure as Ledbetter. Perkins again waived his rights and agreed to talk.

During this interview, Perkins told Davis that he had a split personality, one being Dennis and the other "the Drifter." Perkins said that the previous night he had been paid for his work at the motel and that later the Drifter told him to go to Scott City because he (the Drifter) had done something bad. Davis turned the tape recorder off at this point. Perkins then told Davis he was the Drifter and that he (the Drifter) "went into the motel office, and she was all hot and bothered for him, and she wanted some, and he was going to give it to her." He told Davis he strangled Pepperl.

Mark Kendrick (Special Agent for the KBI) and Officer Danny Shanks (Chief of Police at Oakley) arrived at the Scott City police station. Perkins again was read his *Miranda* rights, and he signed a waiver form.

Perkins told these officers that he had a split personality, with one personality being Dennis, who tried to do good, and the

other being the Drifter, who was evil. Perkins told the officers that on the night of December 6 he had gotten paid and had gone out for drinks. He told them he went back to the motel and met Pepperl at the front door of her office. He said she was wearing a nightgown, had on no bra, and was "swaying her ass." He said he started choking her with a coat hanger. He told the officers that he did have intercourse with her, but that Pepperl did not "want to give it up" so he "took some anyway." Perkins told the officers that Pepperl was dead when he had intercourse with her. He told the officers he had learned to have sex with dead bodies while working for undertakers in Pennsylvania. During this interview Perkins revealed to officers that he had spent time in mental institutions in California.

### 1. Voluntariness of Confession

Prior to trial, the defense filed a motion to suppress Perkins' confessions, arguing that they were not voluntary. The trial court found Perkins' confessions were voluntary. The trial court said:

"I think he effectively and of his own free will and without any coercion at all waived those rights before he gave those statements. He did sign the waivers; seems to me he was warned about his Miranda Rights at least three times about what his rights were, so your motion to suppress the statements, Mr. Fairbanks, will be denied at this time."

We recently reviewed the law concerning voluntariness of confessions in *State v. William*, 248 Kan. 389, Syl. ¶¶ 11, 12, 13, 807 P.2d 1292 (1991). This court said that, in determining whether a confession is voluntary, a court is to look at the totality of the circumstances. The burden of proving that a confession or admission is admissible shall be on the prosecution, and the required proof is by a preponderance of the evidence. When a trial court conducts a full pretrial hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely and voluntarily given, and admits the statement into evidence at the trial, this court accepts that determination if it is supported by substantial competent evidence.

At the motion to suppress hearing, Dr. Robert Schulman testified about Perkins' mental capacity to confess. Dr. Schulman had examined Perkins for a total of three hours. He testified that Perkins had a verbal I.Q. of 67, which is categorized as mildly

mentally retarded, although he admitted that he did not do a complete I.Q. test and that Perkins functions at a higher level. He testified Perkins was a primitive regressed person with a limited capacity to assess reality and with distortions of reality.

Dr. Schulman diagnosed Perkins as being schizophrenic, that is, being split from reality, rather than having true multiple personalities.

Dr. Schulman's testimony does not establish that defendant did not know right from wrong. He did not testify that Perkins was hallucinating or suffering from a delusion at the time of his confessions. He did not testify that Perkins did not realize the words he was speaking. In fact, Dr. Schulman did say Perkins was competent to stand trial.

This still leaves the general questions of whether there was police coercion and how Perkins' mental state interacted with any coercion.

The initial interview by Officer Davis shows no promises, threats, or coercion and that all officers went to great lengths to inform Perkins of his rights.

If anything, Davis was overly friendly. Perkins apparently got upset or reluctant to talk during the interview. Perkins started talking about his past and that he did not get any help when he needed it. The following exchange took place:

"DAVIS: But do you realize sometimes Dennis that that uh, we can, there's only so much help people can give you alright? And a lot of it depends on the help that you're willing to put out for yourself, right?

"PERKINS: Yeah.

"DAVIS: Just like what you mentioned to me a little while ago and you know, that's by, by getting these things out by facing these things. That, that helps. That begins the first step.

"PERKINS: That's what scares me too.

"DAVIS: I know it scares pardner, but we're here. We're here with you. Alright? You don't have to go through it alone. That's what I'm trying to tell you. Alright?"

This does not amount to coercion. It may be an emotional appeal to the defendant, but it is not an abuse of police authority. It is not a threat or promise. It is an attempt to calm an upset individual. This conduct does not make the confession involuntary. The defense would have us reweigh the evidence. That is

something this court does not do. There is substantial competent evidence to support the finding that the confession was voluntary.

Dr. Schulman testified that Perkins was not competent to consent to make statements due to his severe emotional problems. Dr. Schulman's conclusion was based on the premise that Perkins could not understand the significance of waiving his rights, and that Perkins just responded to the situation at hand. Dr. Schulman did not testify that Perkins felt compelled to make statements.

The officers interrogating Perkins, however, testified they were of the opinion he was behaving normally.

Perkins also argues that his waiver of his *Miranda* rights was not knowing. A waiver of *Miranda* rights must be knowing, voluntary, and intelligent. *State v. William*, 248 Kan. at 411. At the suppression hearing, Dr. Schulman testified that Perkins did understand what words mean. He also testified that Perkins functioned at a higher level than his measured I.Q. of 67.

Dr. Schulman did testify that Perkins did not fully understand the implications of waiver of his rights. He testified that, while Perkins could understand he had the right to have a lawyer, he might not understand that he needed one then. He also testified that Perkins would also understand the words, "You don't have to tell us anything." Further, Dr. Schulman admitted that, as to understanding the implications of *Miranda* warnings, a recent survey of college students showed even they did not understand the implications of waiving their *Miranda* rights.

Understanding that one has the right to a lawyer or to not talk is enough to show a knowing and intelligent waiver of *Miranda* rights. To require more would void most waivers. Again, there is sufficient evidence to support the trial court's finding that the waiver was proper.

### 2. Competency to Stand Trial

Prior to trial, the defense filed a motion to determine Perkins' competency to stand trial. The trial court considered two reports on Perkins' mental health. Based on these reports, the trial court found him competent to stand trial. Perkins asserts that the trial court erroneously found him competent to stand trial. Following an outburst by defendant at trial, the trial court denied a motion

for another competency evaluation. Perkins asserts this was also error.

On appeal, the reviewing court's inquiry on a trial court's determination that a defendant is competent is whether the trial court abused its discretion. *State v. William*, 248 Kan. at 415.

K.S.A. 22-3301 provides:

"(1) For the purpose of this article, a person is 'incompetent to stand trial' when he is charged with a crime and, because of mental illness or defect is unable:

"(a) To understand the nature and purpose of the proceedings against him; or

"(b) to make or assist in making his defense."

See *State v. Severns*, 184 Kan. 213, 219, 336 P.2d 447 (1959).

The first report the trial court considered was prepared by Dr. Robert Dysart, a psychologist at High Plains Mental Health Center. His report is inconclusive. He found Perkins to be hostile throughout the entire interview and said a rapport never developed. He noted that Perkins displayed anger toward everyone and everything. He noted that Perkins seemed to have an unusually short attention span and difficulty concentrating. He determined that Perkins had an "antisocial personality disorder." When Perkins was asked about the charges against him, he replied, "I'm not sure I understand it." When asked what murder meant, he replied, "[P]ut em to sleep. Go to sleep." When asked about his defenses, he replied, "Can't use no defense. I don't know what happened." When asked about his attorney, Perkins rambled on about how he did not have any rights. The report concludes:

"Because of Mr. Perkins' lack of cooperation during this interview it cannot be concluded with certainty that he is competent to stand trial. As stated at the beginning of this report, it is felt that he probably is competent, however, based on the evidence presented, it would have to be concluded that he is not competent at this time."

The second report is by Thomas Runge, a psychologist at the Larned State Hospital. Perkins was admitted on January 13, 1989, and was evaluated for several days. The report says that Perkins exhibited no signs of psychotic disorder and that he was oriented to time, place, and identity. The report says that his memory is

intact and that his cognitive functioning is good. Significantly, the report says:

"Although his intelligence is estimated to be within the borderline range (most likely due to very limited formal education), his comprehension and communications skills are quite adequate. He is, however, considered to be a very angry, hostile, manipulative, and impulsive individual who attempts to make himself appear worse off, clinically, and more pathological than he actually is."

As to the specific legal requirements for competency, the report says that Perkins was well aware of the charges against him, knowledgeable about courtroom procedures, and understood the responsibilities of a defendant in regard to working with his attorney. The report concludes that Perkins understood the nature and purpose of the proceedings against him and was able to work with an attorney to prepare and present a legal defense and, thus, met the criteria to stand trial.

While Dr. Dysart's report was, at best, inconclusive, this second report is quite clear. The inescapable conclusion is that Perkins simply was not cooperating with Dr. Dysart. Based on the second report, Perkins met the criteria for competency to stand trial, and the trial court did not abuse its discretion in so determining.

### 3. Denial of Mistrial and of a New Competency Hearing

At trial, Perkins suddenly made the following outburst:

"THE COURT: State's Exhibits 4, 5 and 6 will be admitted at this time. You may publish those to the jury.

"MR. PERKINS: ". . . blow my goddamn brains out. Don't stand a fuckin' chance, man. I didn't choke that damn woman. I didn't rape that damn woman. I don't care what the hell you do with me, just give me a fuckin' gun, I'll blow my fuckin' head off. You guys got the wrong man. Judge, you denied everything I had. You denied my constitutional right for a new counselor. For no reason. You violated my right. I've got the rights as anybody else. I'm just a hitchhiker. I didn't kill that woman. I seen the person that did it. But you people don't want to fuckin' believe me. I am what I am. I'm a blooming' hitchhiker. That DA man had a pleasure. He knows he's got an easy verdict, to find me guilty. People, I don't really care. My ass is six feet under I go back to that jail, I guarantee it. I tried it once, I tried it twice. This ain't right. This is not right. I passed into this town and this was what I get. A Kangaroo court. You're worse than Louisiana. Send me back to jail, man. Send me back to jail. You violated my rights, man. I don't care no more. This is not my rights. You don't

know what it's called, man, to be a hitchhiker. You people don't know what it's like out there living under a street, diggin' food out of a trash can. That woman was good to me, Why the hell would I want to hurt her? I feel sorry for the man that ever did this cause he's a sick puppy and you guys won't believe a fuckin' word I say. I am what I am. Take it or leave it. Get me out of here, Leon. I don't give a damn no more.

"THE COURT: Remove him from the courtroom.

"MR. PERKINS: I don't give a damn anymore. A bunch of sick mother-fuckin' puppies.

"(The Defendant left the courtroom)."

After this, in chambers, the defense moved for a mistrial. Then, after the lunch break, the defendant refused to come to the courtroom and was crying and shaking. An in-chambers conference was held. The trial court expressed the opinion that Perkins was acting. The trial court then warned Perkins that he had to behave in court and Perkins asked to be taken back to jail in Colby and to let the trial proceed without him. This was done and the trial proceeded in his absence. The next morning, the defense, in an in-chambers conference, again moved for a mistrial and also moved for another competency evaluation. The trial court denied both motions, finding that Perkins was putting on an act.

The final part of the Larned State Hospital report (prepared in advance of trial) provides: "It was noted that should Mr. Perkins become behaviorally or communicatively disruptive or uncooperative either with his attorney or during criminal trial proceedings, it would be volitional in nature and not the result of a major mental illness." Based on the record before us, the trial court did not abuse its discretion in not ordering another competency hearing or in granting a mistrial.

The defense next argues that Perkins was denied his right to be present during the in-chambers discussions. The defense characterizes these in-chambers discussions as proceedings regarding competency.

K.S.A. 22-3302(7) provides that the defendant shall be present at hearings conducted to determine the defendant's competency. In *State v. Garcia*, 233 Kan. 589, 594-96, 664 P.2d 1343 (1983), this court said that a defendant has a right to be present at all times when the jury is present in the courtroom and whenever the trial court communicates with the jury.

A defendant's Sixth Amendment right to be present at criminal proceedings does not apply to proceedings involving only matters of law. *State v. Baker*, 236 Kan. 132, 136, 689 P.2d 803 (1984). Whether to declare a mistrial or let the defendant back in the courtroom are matters of law. Further, K.S.A. 22-3302 does not mandate that the defendant be present when the discussion concerns *whether* to hold a competency hearing. *Baker*, 236 Kan. at 137. No reversible error is shown.

### 4. Rape of a Dead Body

The defense argues that the trial court erred in failing to instruct the jury that rape must be committed while the victim is alive. Perkins' statements regarding the crime are contradictory. In his own testimony, he indicated that he had sex with Pepperl while she was alive. However, his statements to police were that he had sex with her after she was dead.

The defense never requested that the jury be instructed that rape can only be committed against a living person.

"A party may not assign as error the giving or failure to give an instruction unless he objects to the instruction stating the specific grounds for the objection. Absent such objection, an appellate court may reverse only if the trial court's failure to give the instruction was clearly erroneous. [Citation omitted.] The failure to give an instruction is clearly erroneous only if the reviewing court reaches a firm conviction that if the trial error had not occurred there was a real possibility the jury would have returned a different verdict." *State v. DeMoss*, 244 Kan. 387, 391-92, 770 P.2d 441 (1989).

Other jurisdictions have faced this problem also. Two jurisdictions have clearly decided that rape requires a living victim. See *People v. Sellers*, 203 Cal. App. 3d 1042, 1050, 250 Cal. Rptr. 345 (1988); *Com. v. Sudler*, 496 Pa. 295, 302-03, 436 A.2d 1376 (1981). The State asserts that one jurisdiction holds that rape may be committed against a dead body, citing *Hines v. State*, 58 Md. App. 637, 473 A.2d 1335, *cert. denied* 300 Md. 794 (1984). The State misconstrues the holding of *Hines*. In *Hines*, the deceased victim was found lying on her back with her legs spread apart. Speaking of the charge of *attempted* rape, the court said of the evidence, "[I]t is not necessary that the circumstances exclude the possibility that the victim was dead before any sexual touching or attempted rape occurred." 58 Md. App. at 666. The court added, "An attempted rape occurs when the perpetrator forms

an intent to rape and takes any action to carry out that intention." 58 Md. App at 666. All the *Hines* court was saying was that if the intent to rape was formed prior to the killing, and the violence was in furtherance of the rape, then the attempt was complete prior to death.

In *State v. William*, 248 Kan. 389, 807 P.2d 1292 (1991), this court considered whether attempted aggravated criminal sodomy could be committed against a dead body. As a starting premise, this court said, "William correctly argues that criminal sodomy (or aggravated criminal sodomy) may not be committed on a dead body." 248 Kan. at 400. Because of the close analogy between aggravated criminal sodomy and rape, the same rule applies: Rape can only be committed against a living person.

Because rape requires a live victim, the question then becomes whether the instruction was clearly erroneous—whether there was a real possibility the jury might have found Perkins not guilty of rape. There was no testimony about the physical evidence (redness around the vagina) that would indicate whether the victim was alive or dead when penetration was made. Perkins' confessions all indicated the victim was dead. He specifically told the officers that he learned to have sex with dead bodies while working with undertakers.

The only time Perkins said the victim was alive was when he took the stand and testified that he had had sex with the victim while she was alive. However, Perkins' testimony seems to have been an attempt to deny any wrongdoing. He denies killing Pepperl and his statements about sexual intercourse seem to be (at least in his mind) an attempt to claim the conduct was consensual.

K.S.A. 21-3502(1) begins, "Rape is sexual intercourse with a person." "Person" implies a living person. The statute goes on to define the circumstances when sexual intercourse is rape (a) when the victim is overcome by force or fear; (b) when the victim is unconscious or physically powerless; (c) when the victim is incapable of giving consent because of mental deficiency or disease. All these circumstances require that the victim be living when the act of intercourse takes place.

Had a request for an instruction or a specific objection to the instruction given been made, the trial court should have instructed the jury that rape cannot take place after the victim is

dead. However, we cannot say the instruction given was clearly erroneous. The instruction that was given required the jury to find that the victim had not consented to sexual intercourse and that she was overcome by force. Both "consent" and "overcome by force" presupposes that the victim is alive. Because it is implicit in the instruction given that the victim be alive, the instruction was not clearly erroneous.

### 5. Instructions on Second-Degree Murder and Voluntary Manslaughter.

The trial court only instructed the jury on felony murder. The defense requested that instructions on second-degree murder and involuntary manslaughter be given as lesser included offenses of first-degree murder and that an instruction on robbery be given as a lesser included offense of aggravated robbery. The trial court denied the request, saying of the lesser included offenses to felony murder that they would not be instructed upon because the evidence of the underlying felonies was strong rather than weak.

A trial court does have the duty to instruct on lesser included crimes. K.S.A. 21-3107(3) provides:

"In cases where the crime charged may include some lesser crime, it is the duty of the trial court to instruct the jury, not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty under the information . . . and upon the evidence adduced. If the defendant objects to the giving of the instructions, the defendant shall be considered to have waived objection to any error in the failure to give them, and the failure shall not be a basis for reversal of the case on appeal."

Although the defense did not request an instruction on voluntary manslaughter, a trial court is under an affirmative duty to give an instruction on a lesser included offense if supported by the evidence, even if a defendant fails to request it. *State v. Cummings*, 242 Kan. 84, 91, 744 P.2d 858 (1987).

Normally, the test of whether an instruction on a lesser included offense is required is where there is any substantial evidence tending to prove that offense. *State v. Armstrong*, 240 Kan. 446, 459, 731 P.2d 249, *cert. denied* 482 U.S. 929 (1987). A corollary to this rule is that "an instruction on an included offense is not proper if from the evidence the jury could not reasonably convict of the lesser offense." *State v. Gregory*, 218 Kan. 180, 183, 542 P.2d 1051 (1975). In reviewing the evidence

to determine whether a lesser included offense instruction should have been given, this court must review the evidence in a light most favorable to the defendant. *State v. Hill*, 242 Kan. 68, 74, 744 P.2d 1228 (1987).

When the primary crime is felony murder, however, this court has used a stricter analysis. A trial court is only under a duty to instruct on a lesser included offense from felony murder when the evidence of the underlying felony is weak or inconclusive. *State v. Sullivan and Sullivan*, 224 Kan. 110, 121, 578 P.2d 1108 (1978). This court has explained that the reason for the rule was said to be "that the killer's malignant purpose is established by proof of the collateral felony." *State v. Wilson*, 220 Kan. 341, 345, 552 P.2d 931 (1976).

K.S.A. 21-3426 defines robbery as "the taking of property from the person or presence of another by threat of bodily harm to his person or the person of another or by force." K.S.A. 21-3427 defines aggravated robbery as "a robbery committed by a person who is armed with a dangerous weapon or who inflicts bodily harm upon any person in the course of such robbery."

The evidence of robbery is strong. A quarter with a hole in it that was known to be kept in the victim's cash drawer was given to a store clerk by Perkins the next day. Perkins, who earned $15 to $20 a day, was arrested with over $70 in his pocket. The cash drawer, which should have contained around $100, was empty. Further, the jury found that Pepperl was killed by Perkins. There is strong evidence of aggravated robbery.

Because there is strong evidence of aggravated robbery and of rape, and the defendant testified that he had sexual intercourse with the victim, an instruction on lesser included offenses was not necessary.

### 6. Insanity Defense

In Kansas, the test for insanity is the *M'Naghten* test, under which the accused is held to be not criminally responsible for his acts (1) where he does not know the nature and quality of the act, or in the alternative, (2) where he does not know right from wrong with respect to the act. *State v. William*, 248 Kan. at 407.

The standard of appellate review for sufficiency of evidence is well established:

"When the sufficiency of evidence is challenged, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Graham*, 247 Kan. 388, Syl. ¶ 5, 799 P.2d 1003 (1990).

Dr. Schulman testified that Perkins was suffering from schizophrenia, paranoid type, and, consequently, had distortions of reality and poor judgment. Dr. Schulman further testified that, in his opinion, Perkins did not understand the nature of his acts or understand whether the acts were right or wrong. Dr. Schulman admitted, however, that Perkins understood that if he used drugs in front of a police officer that he would be locked up. Dr. Schulman also admitted that Perkins would not have killed and raped Pepperl if a police officer had been standing there.

This admission by Dr. Schulman not only defeats most of his other testimony, it goes a long way in proving Perkins was responsible for his acts. If Perkins understood that a police officer would have arrested him for the acts, Perkins knew both the nature of the acts and that they were wrong.

Dr. Schulman's testimony that Perkins is legally insane was suspect for other reasons. In his written report, Dr. Schulman, who had examined Perkins for a total of three hours, was unable to determine whether Perkins was legally insane, but, by the time of trial, Dr. Schulman felt he was able to say Perkins was insane. (The only additional research Dr. Schulman had done was to listen to a 10-minute tape of a law clerk interviewing Perkins.)

If Dr. Schulman's testing was not sufficient to prove Perkins was sane, the State's experts' testing was. Thomas Runge, a psychologist at Larned State Hospital who examined Perkins from August 21 to the beginning of September, said that on various standardized tests that have built-in safeguards to determine whether the patient is being honest, it was determined that Perkins was attempting to be a "faking bad profile," *i.e.*, trying to make himself appear worse than he really is. Runge, who gave Perkins a complete I.Q. test, determined that Perkins' verbal I.Q. was 68, and his performance I.Q. was 78, for a combined

score of around 72. Runge also testified that Perkins had no problems functioning at Larned.

Most significantly, Runge testified that, at the beginning of his stay at Larned, Perkins claimed that the Drifter was another personality but later admitted that he had made this up. While Runge admitted that Perkins is a sick individual, Runge testified that Perkins could understand the nature of his acts and distinguish right from .wrong.

A psychiatrist at Larned, Dr. Anthony Troiano, testified that Perkins showed no signs of schizophrenia and that there was no evidence of hallucinations or of a paranoid delusional process. Dr. Troiano testified that Perkins' real problem was that he had a low frustration tolerance and poor impulse control.

Perkins' actions after the crime indicate that he was sane. After Pepperl was killed, Perkins left Oakley for Scott City, an act that could be construed as Perkins trying to avoid responsibility for the crime.

Based on a review of the record, there is sufficient evidence upon which a reasonable person could conclude, beyond a reasonable doubt, that Perkins knew the nature and quality of his act and that he knew right from wrong with respect to the act.

Affirmed.