IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,931

STATE OF KANSAS,
*Appellee*,

v.

CORNELL A. MCNEAL,
*Appellant.*

SYLLABUS BY THE COURT

1.

A criminal suspect must be advised of their constitutional rights to remain silent and to have an attorney present before being subject to a custodial interview under *Miranda v. Arizona*, 384 U.S. 436, 444-45, 86 S. Ct. 1062, 16 L. Ed. 2d 694 (1966). The State bears the burden to demonstrate by a preponderance of the evidence that a valid *Miranda* waiver occurred.

2.

After *Miranda* warnings have been given, a suspect may knowingly, intelligently, and voluntarily waive their rights to remain silent and to have an attorney present before being subject to a custodial interview.

3.

Kansas courts examine whether a criminal suspect made a knowing, intelligent, and voluntary *Miranda* waiver under the totality of the circumstances in light of (a) the defendant's mental condition; (b) the manner and duration of the interrogation; (c) the defendant's ability to communicate with the outside world; (d) the defendant's age,

1

intellect, and background; (e) the fairness of the officers in conducting the interrogation; and (f) the defendant's English language proficiency.

4.

A knowing and intelligent *Miranda* waiver requires a criminal suspect to have the requisite level of comprehension, such that they understand they have a right to a lawyer before talking to law enforcement or not to talk at all. A suspect's mental capacity directly bears upon the ability to comprehend these rights.

5.

A knowing and intelligent *Miranda* waiver does not require a criminal suspect to know or understand every possible consequence of talking to law enforcement or all possible subjects of questioning.

6.

A criminal defendant has the right to a trial by a jury selected from a fair cross section of the community under the Sixth Amendment to the United States Constitution, section 10 of the Bill of Rights of the Kansas Constitution, and K.S.A. 43-155. A defendant claiming their jury did not represent a fair cross section of the community must show a distinctive group was unfairly and unreasonably excluded from the jury pool due to systematic exclusion in the selection process.

7.

Systematic exclusion from the jury-selection process can be shown by total exclusion from jury service, substantial underrepresentation over a substantial period, or "systematic decimation" at the various stages of jury selection with obvious opportunities for discrimination.

8.

A district court errs by failing to give a jury instruction that is legally and factually appropriate. An implicit bias instruction that encourages jurors to apply a race-switching exercise is not legally appropriate, because it invites jurors to consider imagined facts, which are not evidence, in reaching a verdict.

9.

A defendant must show prejudice to warrant reversing a district court's denial of a for-cause challenge. A defendant is not prejudiced by a district court's denial of a motion to remove a juror for cause when the defendant subsequently removes that juror using a peremptory challenge.

Appeal from Sedgwick District Court; JEFFREY E. GOERING, judge. Oral argument held May 14, 2025. Opinion filed July 25, 2025. Affirmed.

*Caroline M. Zuschek*, of Capital Appeals and Conflicts Office, argued the cause, and *Kathryn D. Stevenson*, of the same office, was with her on the briefs for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BILES, J.:  Police identified Cornell A. McNeal as a suspect in a brutal assault and rape after his DNA matched a swab of seminal fluid taken during the victim's forensic examination. In a custodial interview with investigators, McNeal denied having contact with the victim and speculated the DNA was planted by a past sexual partner who saved his semen to frame him. Three days later, the victim died.

The State charged McNeal with capital murder and rape. A jury convicted him on both counts. At sentencing, the district court merged the rape conviction with the capital murder conviction, effectively dismissing the rape conviction. In this direct appeal, he argues for a new trial, claiming: (1) he did not knowingly and intelligently waive his *Miranda* rights during the custodial interview; (2) the jury pool violated his constitutional right to an impartial jury; (3) the district court did not instruct on implicit bias; and (4) he was prejudiced by the district court's failure to remove a juror for cause. We affirm his conviction.

## MCNEAL WAIVED HIS *MIRANDA* RIGHTS

A suspect knowingly and intelligently waives their *Miranda* rights when they are aware of the rights' nature and the consequences of waiving them. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986). The district court found that, even if McNeal has a cognitive disability, it did not affect his ability to understand his *Miranda* rights. We agree under our standard of review.

### Additional facts

After police identified McNeal as a suspect, officers arrested him on an unrelated, outstanding warrant, so they could question him about the rape and assault. Once they confirmed McNeal was not under the influence of drugs or alcohol, had not been recently injured, and could read and understand English, Detective Tim Relph presented him with a form that included his *Miranda* rights. Relph read McNeal his rights individually, asking each time if he understood:

"DETECTIVE RELPH: Before I ask you any questions, you must understand your rights. Do you understand that?

"[McNEAL:] Yeah.

"[RELPH:] You have the right to remain silent, do you understand that?

"[McNEAL:] Yes.

"[RELPH:] Anything you say can be used against you in court. Do you understand that?

"[McNEAL:] Yeah.

"[RELPH:] You have the right to talk to a lawyer for advice before we ask you any questions and to have one with you during questioning. Do you understand that?

"[McNEAL:] [response inaudible]

"[RELPH:] If you cannot hire a lawyer, the court will appoint one for you. Do you understand that?

"[McNEAL:] Yes.

"[RELPH:] If you do decide to answer questions now without a lawyer present, you still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. Do you understand that?

"[McNEAL:] Yeah."

5

Relph then handed the *Miranda* form to McNeal and asked:

> "[RELPH:] Can you read this statement aloud to me?

> "[McNEAL:] I have read this statement of my rights and understand what my rights are.

> "[RELPH:] Do you understand everything I read to you?

> "[McNEAL:] Yeah.

> "[RELPH:] Okay. Put a check on there if you want to.

> "[McNEAL:] These rights are mine. Do you—Do I wish to talk to you? Uh, yeah."

McNeal signed the form, and detectives proceeded with his interview. Before trial, he moved to suppress his statements to police, arguing he could not knowingly or intelligently waive his *Miranda* rights due to cognitive impairments diminishing his receptive and expressive language abilities. The motion hearing included expert witnesses.

Dr. Antoinette McGarrahan, testifying for the defense, prepared a report in which she diagnosed McNeal with a neurocognitive disorder of unknown/undetermined etiology. She noted he "demonstrated substantial difficulties in processing speed, visual scanning, cognitive control, mental flexibility, reasoning, expressive and receptive language, visual response inhibition, auditory response, verbal learning and recall, and complex visual planning and memory." She testified McNeal had substantial deficits in his ability "to process, take in information, understand it, relate it, synthesize it, and be able to respond." She summarized her concerns as specifically relating to his right to

counsel and his right to silence, explaining that McNeal has deficits in his appreciation for those rights due to, and connected with, the cognitive deficits identified through her neuropsychological testing.

The State's expert, Dr. Ryan Schroeder, disagreed. He testified McNeal had no substantial cognitive difficulty. He explained McNeal could make logical steps in problem-solving and "recall both past information and potentially any future information and do that in a logical and organized manner." Dr. Schroeder noted McNeal's mental processing and verbal fluency test scores show his "thought processes, his thinking, his mental processing, is actually fairly strong." He highlighted that while Dr. McGarrahan had concerns with McNeal's cognitive abilities, like attention and memory, there was no issue about his intelligence or "smarts." The State also presented evidence that McNeal had 32 prior contacts with law enforcement, during which he was advised of his *Miranda* rights multiple times and had invoked his rights on at least three occasions.

In deciding the motion, the district court described the issue as whether McNeal "has some sort of a cognitive impairment that prevents him from processing the consequences of decisions that he would make." The court found McNeal had low average to average intellect and average verbal abilities and academic skills, except for math. It noted Dr. McGarrahan was the only professional who had diagnosed McNeal with a cognitive impairment, unlike the "other professionals who have diagnosed or treated him over the years" at multiple facilities.

The district court also noted in a prior interview in 2011 that McNeal knew he had the right not to talk and the right to an attorney. It gave weight to the fact McNeal had two sensory ways of processing his rights in the interview at issue because Detective Relph read him his rights aloud and gave him the form to read. And as Relph went over each right, the court noted, "Mr. McNeal had no questions about any of those rights, and

7

in the end, indicated that . . . he wished to talk." Ultimately, the court denied the motion, reasoning:

> "[T]here's no indication from the detectives that they picked up any sort of cognitive impairment as they were going over the *Miranda* rights form with Mr. McNeal. There's no indication from the transcript or from the video of the interview that Mr. McNeal had any difficulty understanding what those *Miranda* rights were. Again, it's not the first time that these forms have been reviewed with Mr. McNeal. The answers that he gave to the questions that were asked were appropriate to the questions. The interview as a whole reflects that he . . . understood the questions that were asked. He gave detailed answers. There's just no evidence here that Mr. McNeal was confused or misunderstood the rights that he had to *Miranda*. And I think that to the extent that there is some sort of cognitive disability, the degree to which that disability impairs Mr. McNeal doesn't affect his ability to understand the *Miranda* rights and to make a knowing and voluntary and intelligent waiver of the same."

At trial, McNeal renewed his objection, which the court overruled. The State then played the video for the jury.

*Burden of proof*

The State bears the burden to demonstrate a valid *Miranda* waiver by a preponderance of the evidence. *State v. G.O.*, 318 Kan. 386, Syl. ¶ 8, 543 P.3d 1096 (2024). But McNeal suggests the State should bear an increased reasonable doubt burden, noting textual differences between the Fifth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights. The problem with his argument is that he tries to make it by merely comparing textual differences without explaining why they matter or require the higher burden he advocates. He also does not point to any historical records supporting his view.

8

We reject this surface-level invitation to upend our caselaw. See *State v. Bailey*, 313 Kan. 895, 897, 491 P.3d 1256 (2021) ("[T]he failure to support an argument with pertinent authority or explain why a position is sound despite the lack of authority [is] akin [to] failing to brief the issue. And such a failure leads to a party waiving or abandoning an argument."). We will proceed to address his argument under our existing precedent.

*Standard of review*

An appellate court reviews the district court's decision on a motion to suppress using a bifurcated standard. The district court's findings are reviewed to determine whether they are supported by substantial competent evidence without reweighing that evidence. The ultimate legal conclusion of whether to suppress the evidence is then reviewed de novo. *State v. Bridges*, 297 Kan. 989, 1001-02, 306 P.3d 244 (2013).

*Discussion*

Under *Miranda v. Arizona*, 384 U.S. 436, 444-45, 86 S. Ct. 1062, 16 L. Ed. 2d 694 (1966), a criminal suspect is constitutionally entitled to be advised of their right to remain silent and to have an attorney present before being subject to a custodial interview. After the required warnings are given, a suspect may knowingly, intelligently, and voluntarily waive their rights. *Berghuis v. Thompkins*, 560 U.S. 370, 382, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010). On appeal, McNeal renews his argument that his interview statements should not have been admitted, because he lacked the cognitive ability to knowingly and intelligently waive his rights. He does not contest voluntariness.

The State must show McNeal knowingly and intelligently waived his rights. This asks whether he had the "requisite level of comprehension," such that he had "a full

awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Burbine*, 475 U.S. at 421. A defendant's mental capacity directly bears upon the ability to knowingly and intelligently waive rights. *United States v. Morris*, 287 F.3d 985, 989 (10th Cir. 2002). That said, the State does not need to prove a defendant knew and understood every possible consequence or all the possible subjects of questioning prior to answering law enforcement's questions. *Colorado v. Spring*, 479 U.S. 564, 574, 577, 107 S. Ct. 851, 93 L. Ed. 2d 954 (1986).

McNeal takes umbrage with our court's past formulation of the "knowing and intelligent" inquiry from *State v. Perkins*, 248 Kan. 760, 766, 811 P.2d 1142 (1991). There, the court explained, "Understanding that one has the right to a lawyer or to not talk is enough to show a knowing and intelligent waiver of *Miranda* rights. To require more would void most waivers." *Perkins*, 248 Kan. at 766. In McNeal's view, *Perkins* unfairly lowers the minimum showing that a suspect understands the nature of these rights and the consequences of abandoning them.

But *Perkins* accurately captures the relatively low bar set to confirm a suspect understood the warnings to satisfy the knowing-and-intelligent analysis. Giving *Miranda* warnings "ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him." *Spring*, 479 U.S. at 574. The Supreme Court held this was fulfilled in *Thompkins*, when the suspect, who read and understood English, received a written copy of the *Miranda* warnings with time to read it and the detective also read the warnings aloud. 560 U.S. at 385-86.

In Kansas, we determine a waiver's validity under the totality of the circumstances in light of "(1) the defendant's mental condition; (2) the manner and duration of the interrogation; (3) the defendant's ability to communicate with the outside world; (4) the

defendant's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the defendant's proficiency in the English language." *State v. Mattox*, 305 Kan. 1015, 1042-43, 390 P.3d 514 (2017). This test fairly and accurately reflects the law. Compare *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979) (inquiring "into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights"), with *State v. Harris*, 320 Kan. 31, 40, 562 P.3d 1001 (2025) (explaining the Kansas test implements *Fare*'s requirement that "courts . . . consider *all* the relevant circumstances of each particular case").

Here, the district court specifically found "to the extent that there is some sort of cognitive disability, the degree to which that disability impairs Mr. McNeal doesn't affect his ability to understand the *Miranda* rights and to making a knowing and voluntary and intelligent waiver of the same." And we do not reweigh such credibility determinations when experts express differing opinions.

We hold McNeal knowingly and intelligently made a valid *Miranda* waiver. Absent any cognitive impairment, there is more than enough evidence in the record to conclude McNeal understood his rights; the State met its burden by showing Detective Relph read the warnings aloud one at a time, ensuring McNeal understood each time; and he gave McNeal, who could read and understand English, a copy of the *Miranda* warnings to read with time to do so. See *Thompkins*, 560 U.S. at 385.

NO SYSTEMIC EXCLUSION OR UNDERREPRESENTATION DEMONSTRATED

McNeal next argues his convictions should be reversed because his jury pool lacked any potential jurors identifying as black, denying him an impartial jury drawn from a fair cross section of Sedgwick County. He objected in passing to the jury pool's

11

composition before the trial began after noticing it failed to include any black Kansans. In doing so, his counsel briefly stated:

"The law requires that—and the Fourteenth Amendment of the Constitution requires a jury panel must be drawn from a representative cross-section of the community. We had 60-ish jurors in here today, none of them identified as African-American. Wichita as a city, as far as I know, it's 10 to 12 percent African-American population.

"For remedy, the law requires a lot more of me to show how these people are actually coming into this courtroom. *I just want to make a record and preserve our objection, on its face, the jury cross-section looks unrepresentative to us.*" (Emphasis added.)

The State responded:

"By my count, there were 16 White females, 14 White males, 1 Asian male, 3 Hispanic males, and 2 Hispanic females from the panel of 36, so that's 6 out of 36. And by my math, which is always a little suspect, but do the math yourself, that's 16 percent of the final 36 we qualified are members of some racial or ethnic minority. They are not African-American, but there are minorities on the panel.

"If you look at the original 36 who were impaneled—the original 42, we had 10 of the 42 people who were first sitting in chairs, who I believe, were member, again, Asian, Hispanic communities, that would be around 23 percent. The final 42, I should have said, I think there was 6 out of 42, so about 14 percent. So while they're not African-Americans, no one identified as African-American on the panel, it was not a—a lily white, devoid of minority representation. In fact, we have a final grouping that's—is reflective of racial and ethnic minorities in this community."

The district court overruled the objection, concluding McNeal had not shown Sedgwick County summons prospective jurors using racially biased methods. He raised the issue again in a motion seeking a new trial stating simply that "[t]he jury was not a fair cross section of the community." He made no factual or legal argument in support, nor did he request additional time to research and argue the point. At sentencing when the new trial motion was argued, the defense relied on "the motions that are filed in the record." No additional legal authority or arguments were made. The district court adopted its previous ruling and denied the motion.

On appeal, the parties agree no one in the venire identified as black, but the record only contains racial or ethnic identity for the 36 that were impaneled—and that information is provided solely through the prosecutor's remarks. McNeal does not point to anywhere else in the record to more definitively demonstrate the jury pool's racial or ethnic makeup.

*Standard of review*

Whether a jury represented a fair cross section of the community is a mixed question of law and fact. Cf. *United States v. Chanthadara*, 230 F.3d 1237, 1256 (10th Cir. 2000). This court reviews the factual findings for substantial competent evidence, disregarding any conflicting evidence or other inferences that might be drawn from the evidence, and the conclusions of law subject to unlimited review. *State v. Dooley*, 313 Kan. 815, 819, 491 P.3d 1250 (2021).

*Discussion*

A criminal defendant has the right to trial by a jury selected from a fair cross section of the community under the United States and Kansas Constitutions. U.S. Const.

13

Amend. 6; *Taylor v. Louisiana*, 419 U.S. 522, 526, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975); Kan. Const. Bill of Rights § 10; *State v. Miller*, 308 Kan. 1119, Syl. ¶ 1, 427 P.3d 907 (2018). Our Legislature even codified the right in K.S.A. 43-155.

Here, because the parties agree black Kansans make up a distinctive group, McNeal must show (1) black Kansans are unfairly and unreasonably represented in venires from which juries are selected compared to how many are in the community; and (2) this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979); *State v. Bailey*, 251 Kan. 156, 159-62, 834 P.2d 342 (1992). Systematic exclusion can be shown by either total exclusion from jury service, substantial underrepresentation over a substantial period, or "systematic decimation" at the various stages of jury selection with obvious opportunities for discrimination. *United States v. Test*, 550 F.2d 577, 586 (10th Cir. 1976).

But McNeal does not allege a historical exclusion of black Kansans from jury participation or any defects in the jury selection process employed by the district court. Instead, he argues—without support—that the underrepresentation in his case was so shocking it could not have happened randomly. At oral argument before this court, McNeal's counsel characterized this as a "res ipsa locquitor" claim.

The problem for McNeal is that the record fails to establish systematic exclusion. In *State v. Jordan*, 220 Kan. 110, 114, 551 P.2d 773 (1976), the court rejected a similar argument for lacking proof when the defendant "simply assert[ed]" the jury selection method *must* have been constitutionally infirm because the percentage of black Kansans on his jury did not correspond to the general population. The same is true here and the lack of an adequate record before the district court ends this inquiry. See *State v. Vonachen*, 312 Kan. 451, Syl. ¶ 2, 476 P.3d 774 (2020) ("An appellant has the burden to

14

designate a record sufficient to establish a claimed error. Without an adequate record, the appellant's claim of error fails.").

## NO JURY INSTRUCTION ERROR REGARDING IMPLICIT BIAS

Before voir dire, McNeal asked to show the jury a video on implicit bias entitled "Unconscious Bias" available from the United States District Court for the Western District of Washington. The district court denied the request and noted counsel would have latitude to address bias with individual jurors during voir dire. The court explained:

> "[Implicit bias] makes for a great discussion. It makes for a great study by sociologists and social scientists, but a single instruction in the middle of voir dire is going to give this intellectual epiphany to every single juror that, oh, my God, I have this and this bias? It doesn't. At least the study right now does not seem to accomplish what it's intended to do. You say college students gamed it. My response is college students are more liberal than to have this bias. So we can draw our own conclusions why this study didn't reach the desired effect. But—and we haven't even seen the jurors. We are going to issue probably 250 summons. We will get 125 people come in. They will fill out the questionnaires. We don't know if they are going to be 70 years old, male, female, college students, high school educated. It's going to be a total variety, and to think that a one-size-fits-all, single jury instruction is going to remove any implicit bias when, again, it's not supported by the law, it's not been adopted by the PIK committee, it's not even been suggested or approved by the Appellate Courts at this point in time in Kansas."

The juror questionnaire asked if "you believe the age, gender, race, or socio-economic status of the victim should effect the punishment in a criminal case?" And during voir dire, both parties addressed racial bias. The prosecutor asked: "Does the race of either the victim in this case . . . who was killed, or the man the State is alleging perpetrated this crime, does either of their race have anything to do with this for you?" And he broadened his question further—"Does the fact that we have a Black man on trial

15

in the middle part of the country, does that matter? I mean, is that a relevant consideration? . . . [D]oes race have anything to do with this for you." The prosecutor also asked each juror about their ability to ensure race would not be a part of the jury's verdict. And the defense addressed bias when counsel stated:

> "I so want to revisit some of the things we talked about yesterday, right, I want to dive into issues of bias. I'm sorry, hopefully I'm in the middle of the longest time I'll be talking because I want to hear from you all. But bias sounds like such a nasty word, right. Like, hey, who's bias? You raise your hands if you're bias. It's a nasty word, right.

> "But here's what I mean by biases. Biases are subconscious, unconscious, sometimes—sometimes conscious, but largely unconscious shortcuts, right, we make when we're thinking, right. They serve us well in a lot of different places. If you're walking in the brush and you hear a rattle, that's a bias of danger, right. It's a shortcut. You don't even need to think about it. You need to get out of there.

> "Sometimes we have biases that are harmful, right. And one thing I want to talk about is race. Dive right into it. There's a lot of stereotypes associated with race, right. If we were to list them, some people think black people are dangerous. It's just a bias some people have. Some people think they're, you know, more likely to commit crimes, right. This is bias we need to talk about. Those are shortcuts. And some of them aren't even— they're less nefarious, right."

The defense then individually questioned multiple jurors about racial bias. And at the conclusion of voir dire, counsel asked each juror to swear race would not affect their verdict.

After voir dire, McNeal requested a separate, written implicit bias instruction be given before the presentation of evidence and as part of the final instructions. As support, he pointed to the adoption of a similar instruction in Missouri and the American Bar

16

Association's recommendation to give such an instruction. The requested instruction stated:

> "Justice depends on careful and fair decisions based on a conscious and unbiased analysis of the evidence in this case. It is the duty of every juror to determine the facts based upon the evidence presented at trial. Automatic or reflexive responses influenced by conscious or unconscious preconceptions or stereotypes should not enter into that determination. Bias based upon factors such as race, sex, gender, gender identity, religion, national origin, ethnicity, disability, age, sexual orientation, or marital status has no role in the pursuit of justice. Your conclusions in this case should be based on a fair and unbiased consideration of the evidence and respect for the views of other jurors whose backgrounds and perspectives may be different from yours."

The district court again denied the request, noting it was "reluctant to give it here" "until such instruction has been approved with the PIK committee or at least the Supreme Court." It noted "there was ample opportunity to address this subject during jury selection and there was probably at least an hour spent on the subject."

*Standard of review*

Appellate courts analyze jury instructions by determining whether the instructions at issue were legally and factually appropriate, using an unlimited standard of review of the entire record. *State v. Holley*, 313 Kan. 249, 254, 485 P.3d 614 (2021).

*Discussion*

McNeal argues we should reverse his convictions because the district court failed to give an implicit bias instruction both before and after the evidence's presentation. But first McNeal must establish the district court's failure was erroneous. And to do that, he must show the instructions he wanted were legally or factually appropriate. In *State v.*

17

*Nesbitt*, 308 Kan. 45, 49-50, 417 P.3d 1058 (2018), the court rejected an instruction telling jurors they "'must not make assumptions about the parties and witnesses based on their membership in a particular racial group'" and "'should apply a race-switching instruction exercise to test'" whether any such assumptions influenced their decision.

Likewise, the requested video encourages jurors to use a similar exercise to evaluate unconscious bias' influence:

> "[J]urors have told us that once they were made aware of unconscious bias, *they were able to check in with themselves during the trial and evaluate their decision-making process. Would they come to the same conclusion if the person on trial or the witness were someone of a different age or race or gender?* This kind of conscious evaluation of our decision-making can help us avoid mistakes based on unconscious bias. Only after the evaluation did the jurors feel confident they were judging the person on trial, the witness, or the lawyer fairly.

> "The fact is, most of us don't want to judge others unfairly or be guided by unconscious bias when making decisions. But simply having good intentions does not work. Neither does ignoring things like age, race or gender, because unconscious bias really does happen without us realizing it.

> "What studies have shown does work is to first know that unconscious bias exists and occurs for all of us. *Second, carefully examine our decisions and judgments as jurors, and third, question our decisions by asking whether they would be different if the witness, lawyer, or person on trial or trial was of a different race, age, or gender.* . . . So don't hesitate to ask yourself about unconscious bias, and at the end of the trial, during your deliberations, if you think bias has shaped your evaluation, I encourage you to think about the evidence again with this video in mind . . . ." (Emphases added.)

This falls squarely in line with the instruction rejected in *Nesbitt*. An implicit bias instruction encouraging jurors to apply a race-switching exercise is not legally

18

appropriate because it invites jurors to consider imagined facts that are not evidence when reaching a verdict. *Nesbitt*, 308 Kan. at 49-50. But even if we determined it is legally appropriate by only suggesting, not directing, a bias-switching exercise, McNeal still cannot establish the district court erred.

When instructions given to the jury before deliberations are legally appropriate, it is immaterial if another instruction "might have been more clear or more thorough than the one given." *State v. Hillyard*, 316 Kan. 326, 334, 515 P.3d 267 (2022). Likewise, it is immaterial that giving the video instruction before voir dire might have better addressed bias, when the district court permitted another legally appropriate method to do so. See *Nesbitt*, 308 Kan. at 60 (rejecting bias-switching instruction while endorsing voir dire to "ferret[] out racial or other prejudice that should have no role in arrival at a verdict" by asking "potential jurors to examine their consciences and their consciousnesses, including the possibility of the existence of implicit bias and its unjust effects").

The district court did not err in declining to give the video instruction. For the same reasons, it did not err in refusing to give the requested written instruction.

NO ERROR IN REFUSING TO DISMISS POTENTIAL JUROR FOR CAUSE

During voir dire, the defense moved to strike potential juror M.H. for being unable to presume innocence and apply the reasonable doubt standard. The district court denied the motion. The defense ultimately removed M.H. from the jury with a peremptory challenge. On appeal, McNeal argues the district court's failure to dismiss M.H. for cause did not allow him to use a peremptory challenge with another juror, G.F., who he says he would have challenged.

*Standard of review*

An appellate court will only overrule a trial court's denial of a for-cause challenge if the ruling is clearly erroneous. And even if the district court erred, reversal is only appropriate if the defendant can show they suffered prejudice as a result. *Miller*, 308 Kan. at 1138.

*Discussion*

McNeal's argument focuses on the district court's alleged abuse of discretion in failing to dismiss M.H. for cause, which required the defense to reallocate his peremptory challenge from G.F. to M.H. But whether M.H. should have been dismissed for cause is irrelevant here, because there is no reversible error when "a trial court refuses to excuse a juror for cause and one of the parties subsequently removes the juror using one of their peremptory challenges." *State v. Manning*, 270 Kan. 674, 692, 19 P.3d 84 (2001), *disapproved of on other grounds by State v. King*, 288 Kan. 333, 204 P.3d 585 (2009).

This means McNeal must show he was prejudiced by G.F. serving on the jury. To attempt that, he points to, what he characterizes as, an "unprompted, professed admission[] of holding" bias against those suspected of committing sex crimes. McNeal argues doubts of actual or implicit bias remain even after G.F. "pallid[ly]" agreed he would only convict if the State proved its case.

But the reality of what happened dispels his argument. G.F. raised his hand after the prosecutor asked if anyone has or does know someone associated with a sex crime. He explained one family member sexually assaulted another when he was young. The

20

prosecutor then inquired whether that experience would affect G.F.'s ability to be impartial in the following exchange:

"MR. BENNETT: Okay. Fair enough. The reason I'm asking, are you going to hold that case against either side here? I mean, if someone is mad, they think the cops dropped the ball, I'd like to know that. If you think, I don't think [the guy got] treated— you know, he should have got a lot harsher penalty, the defense probably wants to know that. Are you in either of those camps?

"[G.F.:] Well, obviously, it was close to me, so I think it should have been harsher, but I think it was handled pretty well.

"MR. BENNETT: You're not going to hold that against Mr. McNeal?

"[G.F.:] No.

"MR. BENNETT: All right. Anything else that caused you to raise your hand? Was it just that situation or was there anything else?

"[G.F.:] Maybe the situation just makes me a little bias, I don't know.

"MR. BENNETT: Okay. . . . I understand that when people say it makes me a little more biased, I don't know if they mean, and I don't know if you mean, it makes me more sympathetic to the victims of crime like that.

"[G.F.:] Yes.

"MR. BENNETT: It kind of makes you see it through their eyes a little bit more than I would have otherwise.

"[G.F.:] Yeah.

"MR. BENNETT: Or it makes me hate people who do that more?

"[G.F.:] A little bit on both sides.

"MR. BENNETT: Okay. . . . Sometimes the first step is acknowledging you have a problem, you know, whatever the thing is. So the first step in this case for you, if you want to be on this jury or you don't want to be, but if you're on this jury, you got to acknowledge that to yourself. I might be more sympathetic to the victim, I might be more angry towards a suspect, acknowledging that and saying I can't let that guide me. I have to let the facts guide me. Is that a process—mental process you can go through?

"[G.F.:] I'm not sure.

"MR. BENNETT: Okay. If the judge told you, you can only make the decision based on the facts you heard in the case, could you do that?

"[G.F.:] I believe so.

"MR. BENNETT: Okay. To be real blunt, you wouldn't convict this man based solely on what happened to your family member?

"[G.F.:] No.

"MR. BENNETT: If we don't prove our case, you're not going to convict him; fair statement?

"[G.F.:] Yes."

This shows G.F. was willing to set aside what happened to his family member and consider the case solely based on the presented law and facts. Without something more, McNeal fails to carry his burden to show prejudice from G.F. serving on the jury, and it is irrelevant whether the district court should have dismissed M.H. for cause.

22

Affirmed.

WILSON, J., not participating.